Filed 5/19/25  P. v. Lytle CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CORAL ANNETTE LYTLE,<br><br>    Defendant and Appellant. | F088275<br><br>(Super. Ct. No. VCF358009)<br><br>**OPINION** |

### THE COURT\*

APPEAL from an order of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Jyoti Meera Malik, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*    Before Levy, A.P. J., Peña, J. and Snauffer, J.

## INTRODUCTION

Appellant and defendant Coral Annette Lytle (appellant) pleaded guilty to 21 felony counts for sexually molesting two minors. She was sentenced to four years in prison. The trial court ordered appellant to pay noneconomic victim restitution of $100,000 to each minor pursuant to Penal Code[1] section 1202.4, subdivision (f)(3)(F). On direct appeal, the restitution order was reversed and the matter remanded for further proceedings. On remand, the trial court conducted another hearing and ordered appellant to pay $50,000 to each minor as noneconomic victim restitution.

On appeal, appellate counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) Appellant did not file a supplemental brief on her own behalf. We affirm.

## FACTS[2]

"[Appellant] was 40 years old at the time of the offenses involving M.W. and E.G. According to the evidence presented at the preliminary hearing, 14-year-old M.W. briefly dated [appellant's] teenage daughter. On several occasions, [appellant] bought cigars and alcohol for M.W. and sent him nude photographs. Often, and even after M.W. and [appellant's] daughter stopped dating, [appellant] would pick up M.W. from his home while his parents were sleeping and then return him home at 5:00 a.m. [Appellant] once went to M.W.'s home while his parents were away and performed oral sex on him. On

---

[1]     All further statutory citations are to the Penal Code unless otherwise indicated.

[2]     After notice to the parties and without objection, this court takes judicial notice of the record filed in this court in appellant's direct appeal, *People v. Lytle* (F082443), that was transferred to the First District Court of Appeal pursuant to the Supreme Court's order of August 9, 2022; and the nonpublished opinion filed by the First District, Division Three in appellant's direct appeal, *People v. Lytle* (Jan. 10, 2023, A165859) (*Lytle*). The following facts are taken from that opinion's factual statement, which in turn was taken from the preliminary hearing testimony; the parties stipulated to the preliminary hearing evidence as the factual basis for her pleas.

another occasion, they performed oral sex on each other and had vaginal sex in the back of [appellant's] car.

"[Appellant] also engaged in sexual relations with 15-year-old E.G., who dated her other daughter. During the first of three incidents, the two engaged in oral sex and unprotected sexual intercourse while in [appellant's] car at a park. During the second incident, the two had sexual intercourse in [appellant's] parked car on the street. In the third incident, E.G. said he was not interested and had a test the next day, but [appellant] urged him on and the two had sexual intercourse in a Walmart parking lot. E.G. stopped these sexual relations because he was friends with [appellant's] daughters and had to interact with [appellant's] husband, and E.G. felt badly that [appellant] was cheating on her family with him. After E.G. broke it off, [appellant] sent him nude messages saying he would miss her." (*Lytle*, *supra*, A165859.)

Also at the preliminary hearing, Detective James Cummings testified he advised appellant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and she agreed to answer questions. Appellant, who was 40 years old, admitted that she provided her daughters and two minor victims with cigars and alcohol on two or three occasions, and she drove the victims back to their homes in the early morning hours, to make everybody happy. She also admitted sending nude videos and photographs to the two victims, and admitted she used poor judgment.

## PROCEDURAL BACKGROUND

On or about April 2, 2018, an information was filed in the Superior Court of Tulare County charging appellant with counts 1 through 4, unlawful sexual intercourse with a minor under the age of 16 years, committed by someone who was over 21 years old (§ 261.5, subd. (d)); counts 5 through 8, arranging to and meeting a minor for the purpose of engaging in lewd and lascivious behavior (§ 288.4, subd. (b)); counts 9 through 12, unlawfully contacting a minor with the intent to commit sexual offenses (§ 288.3, subd. (a)); and counts 13 through 21, committing a lewd and lascivious act

3.

when the victim is a child of 14 or 15 years, and the appellant is at least 10 years older than the child (§ 288, subd. (c)(1)).

The information alleged appellant committed the offenses in September and October 2017; E.G. was the victim in counts 1 through 3, 5 and 6, 9 and 10, and 13 through 17, and he was 15 years old; and M.W. was the victim in counts 4, 7 and 8, 11 and 12, and 18 through 21, and he was 14 years old.

Appellant was personally served with a criminal protective order that prohibited contact with the two victims.

**Plea Hearing**

On October 1, 2019, the trial court convened a hearing, where the court gave an "indicated sentence" of four years in prison if appellant pleaded guilty to all 21 felony counts. Counsel stated appellant was prepared to enter pleas based on that disposition. The prosecutor objected to the indicated sentence and argued appellant should receive additional prison time based upon the recommendation of probation because of the seriousness of the offenses. The court stated it would consider these arguments at the sentencing hearing. Thereafter, appellant pleaded guilty to all 21 felony counts.

Appellant also pleaded guilty in a separate misdemeanor case to four counts of contributing to the delinquency of a minor, with the victims identified as S.L., J.L., and B.N., with the offenses committed on or about and between February 1 and June 6, 2019 (§ 272, subd. (a)(1)).

**Sentencing Hearing**

On November 4, 2019, the trial court conducted the sentencing hearing. The prosecutor again objected to the court's indicated sentence of four years and argued a longer prison term was more appropriate.

The trial court heard statements from the victims' family members. "M.W.'s father appeared and stated M.W. was 'physically, emotionally, and intellectually victimized by [appellant]' and the 'trauma experienced by him terrifies him to have to

4.

relive this episode and come in here and speak.' He described M.W. as an 'an athlete, a good student, and very outgoing' who 'became sullen, lost interest in activities, and wanted to be alone.' Moreover, M.W. was in therapy and had conversations with his brother that caused his brother concern." (*Lytle*, *supra*, A165859).

"With regard to E.G., victim impact statements were offered by his father and grandfather, and a victim advocate read a statement by E.G.'s mother into the record. E.G.'s father stated that E.G. was bullied by his peers and that he lost friends and withdrew from social life at school. E.G.'s father and mother indicated that E.G. blamed himself for the pain caused to [appellant's] children, and E.G.'s mother indicated generally that E.G. saw counselors numerous times and was in ongoing therapy. According to E.G.'s father, E.G. had suicidal thoughts at one point but was doing 'all right' now and had verbally committed to a college to play a particular sport. E.G.'s grandfather indicated he believed E.G. would need continued counseling but focused his remarks on how [appellant's] action had a negative impact on the entire family." (*Lytle*, *supra*, A165859).

The trial court sentenced appellant to four years in prison based on the midterm of three years for count 1, and a consecutive term of one year (one-third the midterm) for count 4, with sentences for the remaining offenses either imposed concurrently or stayed.

The trial court ordered appellant to pay a $10,000 restitution fine (§ 1202.4, subd. (b)) and stayed the parole revocation fine in the same amount (§ 1202.45). The court also imposed $840 for the court operations assessment (§ 1465.8, subd. (a)(1)) and $360 for the criminal conviction assessment (Gov. Code, § 70373).

The trial court ordered appellant to register as a sex offender (§ 290). The court stated the criminal protective order remained in effect to prohibit her from having contact with the victims, prohibited her from visiting any child under the age of 18 years, and she could only have contact with minor family members in the presence of another adult to supervise.

Finally, the trial court ordered appellant to pay victim restitution and set a hearing on that matter.

**Victim Restitution Motions**

"The prosecution filed motions seeking $250,000 in noneconomic restitution for each victim pursuant to section 1202.4, subdivision (f)(3)(F) ([§] 1202.4(f)(3)(F)), for the victims' past and future psychological harm. In its initial motion filed in late March 2019, the prosecution referenced materially identical written versions of the victim impact statements from the victims' family members which had been placed in the record after [appellant] entered her initial plea earlier that month. Though its motion did not identify the point in time when E.G. and M.W. spoke of their psychological harm, the prosecution argued that the extent of such harm warranted the $250,000 award and that, pursuant to *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*), $250,000 for each victim would be appropriate as an amount that did not shock the conscience or suggest prejudice or corruption.

"Prior to sentencing, the probation department had filed a sentencing report that said nothing about any mental health issues suffered by victim M.W. as a result of [appellant's] crimes, evidently because the department was unable to reach M.W.'s father. The report, however, contained a short paragraph echoing the victim impact statements of E.G.'s family members about the impact of the crimes on him. After indicating that the prosecution had provided a copy of its motion for restitution, the probation report summarily concluded: 'Therefore, as victims M.W. and E.G. have claimed $250,000 each, in noneconomic losses via psychological harm, provided in the [prosecution's] [m]otion, [p]robation recommends restitution in the amount of $250,000 be paid each victim, M.W. and E.G.'

"Then, on January 16, 2020, the prosecution filed a supplemental motion for restitution. Citing the probation report and the victim impact statements from the victims' parents, the prosecution asked the court to make a prima facie ruling regarding

6.

restitution as stated in the probation report and the burden should now be on the [appellant] to refute the amounts." (*Lytle*, *supra*, A165859, fns. omitted.)

Appellant opposed the motion for victim restitution and argued the prosecution presented no evidence to support the victims' claimed losses. (*Lytle*, *supra*, A165859).

**Victim Restitution Hearings**

"At a restitution hearing on January 30, 2020, the court indicated it needed more information and wanted to hear from a mental health professional. In the court's words, 'it's very hard for me to come up with a monetary amount when I don't know the extent of what's going on other than representation from family members' and 'I need something a little bit more along the line of professional levels' in order to quantify the appropriate amount of restitution. Specifically, the court said it wanted to hear 'a counselor's assessment of progress and prognosis' and 'what affect the counselor has observed.' The court scheduled a future contested restitution hearing.

"At the hearing in June 2020, the prosecution indicated it would come back at a later date after gathering the additional materials the court had requested, but in the meantime E.G.'s pastor was present to testify. E.G.'s pastor, who had spoken with and counseled E.G. about seven times after the crimes were reported, gave the following testimony. E.G. was easy-going before the crimes but in 'emotional shock' after the abuse and full of sadness and guilt because of what would happen to [appellant's] children. E.G., at least initially, had no concept about how this would impact his future. E.G. told the pastor he was being taunted and threatened at school, and E.G. wanted to quit sports or change schools, or wished his family could move. Although E.G. presented as suicidal at the midpoint of his meetings with the pastor, he moved on from that and instead started using alcohol and marijuana more regularly. E.G.'s pastor indicated that E.G. had 'gotten through the trauma' and 'feels better' but has a long road ahead. The prosecution presented no evidence concerning M.W. at this hearing.

"At the last restitution hearing in February 2021, the prosecution indicated that it had obtained an expert pursuant to the court's earlier request for additional information, but that due to Covid and numerous continuances, it no longer had the expert. Nevertheless, the prosecution contended there was ample information to make a finding for noneconomic restitution based on the victim impact statements at the sentencing hearing. The prosecution again asked for $250,000 in restitution for each victim to compensate for the pain the victims suffered and will continue to suffer. [Appellant] objected, arguing that the prosecution's numbers were 'tethered to nothing' and also that the bullying that the victims endured could not be ascribed to her." (*Lytle*, *supra*, A165859.)

"Ultimately, the court made its ruling, stating: 'I have spent nine years as the presiding judge of juvenile court and I'm very well aware of the far reaching consequences of child trauma and how it effects [*sic*] the futures from trafficking cases and things like that. [¶] Based on that, I am awarding $100,000 to each of the victims in restitution.' " (*Lytle*, *supra*, A165859.)

On February 10, 2021, the trial court filed the order for appellant to pay $100,000 in restitution for noneconomic damages to each victim, pursuant to section 1202.4, subdivision (f)(3)(F).

**Direct Appeal**

On January 10, 2023, the First District Court of Appeal, Division Three, filed the nonpublished opinion in appellant's direct appeal in *Lytle*, and addressed appellant's challenges to the noneconomic restitution order of $100,000 for each victim. *Lytle* rejected appellant's contentions "that the noneconomic restitution order violated her Sixth Amendment right to a jury trial and that the statute authorizing such restitution violates the federal and state equal protection clauses." (*Lytle*, *supra*, A165859.)

*Lytle* agreed with appellant that the trial court "abused its discretion by not stating the method or factual basis it used to calculate the restitution amount" because it failed to

identify "any specific evidentiary basis for its awards or otherwise explain how it arrived at the $100,000 figure for each victim. Rather, after hearing from the victims' family members, the court indicated, at least initially, that it needed information from mental health professionals to calculate the appropriate amount of restitution. Then, upon learning at the February 2021 restitution hearing that the prosecution's mental health expert would not be available, the court issued its order of $100,000 to each victim.… [T]he trial court here merely stated its award was based on its own juvenile court experience and its awareness—apparently from 'trafficking cases'—of the consequences of child trauma and its future effect. But this was not a trafficking case, and the record here does not supply an obvious basis for the magnitude of restitution ordered for each victim. Thus, we cannot simply excuse the trial court's failure to mention any facts, cite any reliable evidence, or otherwise explain how it calculated the respective amounts of restitution." (*Lytle*, *supra*, A165859, fn. omitted.)

*Lytle* reversed the noneconomic restitution order and remanded the matter for further restitution proceedings: "The trial court may, if it deems it appropriate, receive additional evidence and reconsider the noneconomic restitution amount. When issuing a future order concerning noneconomic restitution, the court must ensure that the record is sufficient to permit meaningful review." (*Lytle*, *supra*, A165859.)

**VICTIM RESTITUTION PROCEEDINGS ON REMAND**

On August 29, 2023, on remand, the People filed a supplemental motion for the trial court to again impose noneconomic victim restitution to both victims pursuant to section 1202.4, subdivision (f)(3)(F). The People argued the evidence already showed, and additional evidence would be introduced, to prove both victims continued to suffer emotional problems because of appellant's sexual abuse, and filed letters from the victims' family and friends in support of the motion.

On October 24, 2023, defense counsel filed a response, and argued the People failed to present any rational basis for the trial court to award noneconomic restitution to the victims.

**Victim Restitution Hearing**

On February 23 and June 21, 2024, the trial court held the contested hearing on remand to determine noneconomic restitution for the two victims.

### M.W.'s Testimony

M.W. testified at the hearing, and stated he was 21 years old. M.W. stated he started dating appellant's daughter when he was in the seventh grade. In 2017, when he was 14 years old, appellant started to have an inappropriate sexual relationship with him, that was eventually reported to the police.

M.W. stated when "this whole thing came to light with court and throughout high school," everybody found out about it. M.W. would go to sleep at night and pray that nobody would ask him another question about it. Everyone in his school read about appellant's arrest and they asked him what happened. M.W. was not strong enough to admit what happened to his closest friends. He lied to them, and that drove a wedge in his relationships that continued to the present day, because he would not allow his friends "to really understand me and understand what I was going through."

M.W. testified a couple of months after the incident, he started going to counseling. He was 14 and 15 years old, and thought about what happened to him on a daily basis. He was concerned about everyone else's opinion about him. He went to three or four sessions, and stopped going because he felt it was better "to get this all out of sight, out of mind. And it definitely was" better to put it behind him. He had not gone to counseling since that time.

M.W. said his family knew he did not want to talk about it, and he was grateful for his family's support system that later made things a lot easier. M.W. testified he found it hard to be in a relationship with and trust women because of what appellant did to him.

10.

He only knew "one other guy that was molested by a woman, so people kind of seem to take that in a different light than the vice versa."

M.W. testified he spent four years "lying to everyone" about the incident, and six or seven years "trying to forget" what happened to him. M.W. said that about one year ago, he finally had "the courage to talk about it." For purposes of this hearing, "it was definitely pretty difficult having to go back through it and just relive what was the hardest part of my life."

### *E.G.'s Letter*

E.G., the second victim, did not testify but filed a letter with the trial court about how the incident changed his life. E.G. was 21 years old when he wrote the letter, and stated he was harassed and bullied when the police investigation was revealed to the public. It affected his ability to participate in school activities, he suffered from social anxiety and panic attacks, and he had suicidal thoughts.

E.G. no longer had suicidal thoughts, but still suffered from social anxiety, panic attacks, and depression. E.G. felt he was taken advantage of, he would never stop having to deal with his feelings because of appellant's conduct, and he believed he would be scarred for the rest of his life.

## The Parties' Arguments

The prosecutor argued the victims' statements provided the trial court with a rational and factual basis to award a significant amount to each victim for noneconomic restitution.

Defense counsel acknowledged M.W. went to three or four counseling sessions "right after the fact," but asserted M.W. only testified about "normal day-to-day issues that anybody growing up through their teenage and early 20 years go through, so there was no evidence that what he was going through was directly related to this particular incident." Defense counsel argued that if M.W. still had any "issues," he would have been attending counseling.

Defense counsel complained that E.G.'s letter was identical to what he previously submitted to the trial court for the initial victim restitution hearing. E.G.'s letter stated he was in therapy for approximately one year and had not attended further sessions.

Defense counsel concluded that "it appears that both of these young men are perfectly fine other than dealing with what normal people of their age … go through on a daily basis, and it's not directly related to this particular conduct."

The prosecutor replied that if the trial court was determining victim restitution for economic damages, that amount could be based on the costs of attending counseling or specific services. Section 1202.4, subdivision (f)(3)(F), however, specifically permitted the court to order restitution for noneconomic, subjective losses, including but not limited to pain, suffering, and emotional distress, which was the subject of the current motion before the court. The prosecutor further argued that while M.W. only attended three or four counseling sessions, that did not mean he was "suddenly all better or has no effect of this as defense counsel is arguing," and M.W. testified that appellant's conduct still affected his life.

**The Trial Court's Order**

The trial court found it was "ludicrous" for defense counsel to claim that appellant's criminal conduct did not affect the two victims, and found the evidence showed it "affected them severely. Not only did it cause them to be bullied while in high school, it caused them to drop out of high school programs.… [T]hese boys basically were withdrawn because of the situation as it was. I think there are lasting effects to that." The evidence showed both victims still had emotional problems, and "young men are less likely to seek help even when they need it until later on in life when they realize that they need to have that, so I believe that there is certainly noneconomic damages having been done to these [victims] as a result of the conduct of [appellant] .…"

The trial court stated it would order noneconomic victim restitution based on "approximately what I believe it will cost them as far as counseling … because I think

12.

that they're going to need that and I think that even if they don't get counseling, then they're going to suffer financial losses because of their situation."

The trial court ordered appellant to pay $50,000 to each victim "for the damages, noneconomic, that were done to them at such a young age and vulnerable time in their life." Defense counsel stated appellant was no longer in custody and had been successfully discharged from parole. The court replied the order could be collected as a civil judgment.

On June 27, 2024, appellant filed a notice of appeal.

## DISCUSSION

As noted above, appellate counsel filed a *Wende* brief with this court. The brief also included counsel's declaration that appellant was advised she could file her own brief with this court. On January 30, 2025, this court advised appellant by letter that she could file a supplemental letter or brief raising any arguable issues. Appellant did not do so.

Given the appellate court's decision to remand the matter, however, we briefly review the subsequent restitution hearings and affirm the trial court's order.

## A. Section 1202.4

Section 1202.4, subdivision (f) "requires the trial court to order a defendant to pay victim restitution 'in an amount established by court order, based on the amount of loss claimed by the victim … or any other showing to the court.'" (*People v. Lehman* (2016) 247 Cal.App.4th 795, 800.)

"With one exception, restitution orders are limited to the victim's economic damages." (*Smith*, *supra*, 198 Cal.App.4th at p. 431.) "Economic damages are 'objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.'" (*Ibid*.)

13.

The exception is stated in section 1202.4, subdivision (f)(3)(F), that provides "restitution may be ordered for '[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7.' [Citation.] 'Noneconomic damages are "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." [Citation.]' " (*People v. Gomez* (2023) 97 Cal.App.5th 111, 115 (*Gomez*).)[3] "[T]here must be *some* evidence of the impact of the crime on the particular victim." (*Id*. at p. 120.)

" ' "A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered." ' [Citation.] 'The court "must demonstrate a rational basis for its award, and ensure that the record is sufficient to permit meaningful review. The burden is on the party seeking restitution to provide an adequate factual basis for the claim." ' " (*Gomez, supra*, 97 Cal.App.5th at p. 116.)

**B.  Analysis**

The trial court did not abuse its discretion at the hearing on remand when it awarded noneconomic restitution of $50,000 to each victim. Moreover, the record supports the court's description of defense counsel's position as "ludicrous," when counsel argued "both of these young men are perfectly fine other than dealing with what normal people of their age … go through on a daily basis, and it's not directly related to this particular conduct."

---

[3]    In counts 13 through 21, appellant pleaded guilty to committing a lewd and lascivious act when the victim is a child of 14 or 15 years, and the perpetrator is at least 10 years older than the child, as to both victims, in violation of section 288, subdivision (c)(1).

The trial court's order was based on direct evidence provided by the two victims about the impact of appellant's crimes on their lives, both at the time of the incidents when they were minors and continuing to the present as adults.  M.W. testified he felt compelled to lie to his friends about what happened because he worried what they would think about him, he could not tell his friends about it, it continued to drive a wedge in his relationships, and he still found it hard to trust women because of what appellant did to him.  E.G. stated he suffered from social anxiety, panic attacks, and suicidal thoughts, and while he no longer had suicidal thoughts, he would be scarred by appellant's conduct for the rest of his life.

The trial court properly relied on the statements from the two victims, which constituted a rational and factual basis to order noneconomic restitution to them.  (See, e.g., *People v. Lehman*, *supra*, 247 Cal.App.4th at pp. 803–804; *Smith*, *supra*, 198 Cal.App.4th at pp. 435–436; cf. *Gomez*, *supra*, 97 Cal.App.5th at pp. 119–120.)

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The restitution order is affirmed.